**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANNA**
**INDIANAPOLIS DIVISION**
***(Electronically Filed)***

| | | |
|---|---|---|
| BRIGHTVIEW LANDSCAPES, LLC<br><br>Plaintiff,<br><br>v.<br><br>ANGELA OVERTON,<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Civil Action No. 1:26-CV-00718 |

**<u>VERIFIED COMPLAINT</u>**

Plaintiff BrightView Landscapes, LLC ("BrightView"), by and through its undersigned counsel, and for and in support of its Complaint against Defendant Angela Overton ("Overton"), hereby avers as follows:

## I. <u>Introduction</u>

1. BrightView is one of the nation's leading commercial landscape companies. It provides a wide array of landscaping and maintenance services, including, but not limited to, landscaping design; landscaping maintenance; snow and ice removal; water and irrigation services; and tree care. Its customers include corporate campuses, sports stadiums, museums, universities, casinos, amusement parks, public parks, private homeowner associations, and many other public and private businesses.

2. BrightView employed Overton as an Account Manager from the time that she joined the company in September of 2020 until she voluntarily resigned in December of 2025. At BrightView, an Account Manager is the relationship manager and primary point of contact between BrightView and its customers. As such, Overton was responsible for overseeing all the

work BrightView did for dozens of commercial property owners in and around Indianapolis, including some of BrightView's most significant clients in this region.

3. Critically, the Account Manager role is not limited to ensuring contract compliance and superior service for BrightView's existing business. Account Managers are also expected to devote significant time and energy into expanding the work that BrightView does for existing customers. Account Managers do this (a) by recommending additional beautification and property enhancement projects that could be performed on properties where Brightview is already contracted to perform landscaping services, and (b) by soliciting existing commercial clients to allow BrightView to perform services at other properties within a customer's portfolio that are not currently serviced by BrightView.

4. Overton's role within the company made her privy to a wide range of confidential information that BrightView uses to succeed in the highly competitive commercial landscaping industry.

5. The confidential information that Overton knows includes, but is not limited to, the identities of the precise individuals at BrightView's customers who make purchasing and contracting decisions; the annual spend of its customers; service issues, if any, that such customers may be encountering; BrightView's labor costs; BrightView's project estimator model; BrightView's pricing; discounts, rebates, and pricing that BrightView receives from vendors; and BrightView's target profit margins.

6. In light of Overton's role as a steward of BrightView's customer goodwill and the necessity of giving her access to BrightView's most sensitive competitive information, BrightView required as a condition of her employment that Overton execute a Confidentiality,

Noncompetition, and Nonsolicitation Agreement ("Agreement"), which Overton signed on September 20, 2020. A true and correct copy of the Agreement is attached hereto as Exhibit A.

7. Overton's Agreement with BrightView contains several restrictive covenants to protect BrightView's legitimate interests, including a narrowly drawn non-competition clause prohibiting Overton for one year from working in similar capacity for a competitor in the territory she covered for BrightView. *See* Agreement at § 5. In addition, Overton's Agreement contains a two-year non-solicitation restriction that provides she may not "directly or Indirectly solicit, divert, or appropriate, or attempt to solicit, divert, or appropriate, any Customer or accept any business from any Customer with whom [Overton] had Material Business Contact" in the last two years of her BrightView employment. *See* Agreement at § 6.

8. On December 30, 2025, Overton voluntarily resigned from BrightView. During her exit interview, Overton stated that she was going to work for Hittle Landscaping ("Hittle"), but that she would not perform a role that violated her Agreement. Hittle also provides commercial landscaping and maintenance services, and it is a direct competitor of BrightView and a "Competing Business" within the meaning of the Agreement.

9. Although Overton had promised to honor the restrictive covenants in her Agreement when she resigned, BrightView recently discovered that Overton has been working as an Account Manager for Hittle and that she has been assigned to manage the accounts of one of her largest former BrightView customers, Visionary Enterprises, Inc. ("VEI"). VEI is a subsidiary of the Community Health Network, Inc. – a community health network with more than 50 hospitals and healthcare campuses in and around Indianapolis. VEI engages contractors to perform landscaping maintenance and snow and ice removal services for properties in the Community Health Network.

10. BrightView learned that Overton was working as an Account Manager at Hittle for VEI properties after Overton contacted a BrightView subcontractor that she used to work with in her former BrightView role. In that call, Overton sought information about the landscaping products that VEI preferred and disclosed that she had met with VEI's Director of Property Management—the very person who had served as Overton's principal VEI contact for years while she worked for BrightView.

11. BrightView immediately wrote to Overton to remind her of her contractual obligations under the Agreement and to demand information on her employment status and responsibilities with Hittle.

12. Overton responded on March 16, 2026, and admitted that she is employed by Hittle as an Account Manager, that she has been assigned to manage Hittle's projects for VEI, and that she is in regular contact with the same VEI property manager with whom she formed a relationship while at BrightView.

13. Overton asserts that her continued work with the same VEI property manager that she serviced at Brightview does not violate her Agreement because she is only handling VEI properties outside the geographically limited territory covered by her non-compete. Upon information and belief, that assertion is false given, among other things, the typical responsibilities of an Account Manager. And regardless, Overton's position ignores that there are no geographic limitations on her non-solicitation obligations: she is not permitted to solicit or accept business from her former BrightView customers—period. And as a Hittle Account Manager assigned to VEI, she is currently working in a position where she is required not only to solicit new business from VEI, but also to assist other Hittle Account Managers to do so in further violation of her covenants.

14. Overton's breach of contract threatens BrightView with irreparable injuries relating to the loss of its goodwill and the misuse and disclosure of BrightView's confidential information.

15. BrightView therefore brings this action to enforce its rights and to protect its goodwill and confidential information.

## II. The Parties

16. BrightView is a limited liability company organized under the laws of the State of Delaware. BrightView's principal place of business is located at 980 Jolly Road, Blue Bell, Pennsylvania 19422.

17. BrightView's sole member is BrightView Holdings, Inc., a corporation organized under the laws of the State of Delaware with its principal place of business located at 980 Jolly Road, Blue Bell, Pennsylvania 19422.

18. Overton is an individual who is a citizen of the State of Indiana residing at 8040 Harbor Walk Place, Indianapolis, Indiana 46237.

## III. Jurisdiction and Venue

19. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 in that this is a civil action between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

20. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (b)(3) because it is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred and because the defendant is subject to the court's personal jurisdiction.

## III. Factual Background

### A. BrightView's Business.

21. BrightView is a landscaping business that traces its roots back to 1939. It was originally founded by Theodore Brickman, Sr., who started a landscape company called "Brickman Group, Ltd." Over the decades that have passed since, the company continued to add services until 2014, when it merged with ValleyCrest Landscape Companies. The combined companies became known as BrightView, and today, BrightView provides landscaping and maintenance services throughout the Hittle States.

22. BrightView helps its customers design landscapes that are both beautiful and functional. Once designed, BrightView develops and implements the projects to turn the designs into reality.

23. BrightView also maintains its customers' landscapes, and its maintenance services are extensive. They include fertilization, lawn care, tree care, weed and pest management, storm preparedness, water and irrigation management, and snow and ice removal services.

24. BrightView serves many different markets. Its customers include corporate campuses, sports stadiums, retail shopping centers, places of worship, museums, universities, casinos, amusement parks, public parks, private homeowner associations, and many other public and private businesses.

25. In short, BrightView is national business providing extensive landscaping and maintenance services to customers engaged in diverse businesses.

**B. Overton's Agreement with BrightView.**

26. Given the extensive goodwill with customers of and customer prospects for BrightView with which Overton was entrusted – along with the tremendous amount and significant sensitivity of confidential and proprietary business information that was shared with Overton and

to which she was given access – BrightView required her to execute the Agreement that is the subject of this action.

27. BrightView conditioned Overton's employment upon her acceptance of the terms and conditions set forth in the Agreement.

28. In Section 3 of the Agreement, Overton agreed that he would not use or disclose BrightView's "Confidential Information" except on behalf of BrightView and in furtherance of its business:

> **Non-Disclosure and Non-Use of Confidential Information and Trade Secrets.** During the term of team member's employment and following the voluntary or involuntary termination of team member's employment for any reason . . ., team member will not, except as authorized and required to perform team member's duties for BrightView, directly or Indirectly: use, disclose, reproduce, distribute, or otherwise disseminate BrightView's Confidential Information and Trade Secrets, or take any action causing or failing to prevent any such information to lose its character or cease to qualify as Confidential Information or a Trade Secret. . . This prohibition applies regardless of whether the Confidential Information or Trade Secret was acquired before the effective date of this Agreement or thereafter.

*See* Agreement at § 3.

29. The Agreement defines the term "Confidential Information" in pertinent part as follows:

> **"Confidential Information"** means (i) competitively sensitive information, (ii) of importance to BrightView, and (iii) that becomes known to team member through his or her employment with BrightView. Confidential Information includes Trade Secrets, but an item of Confidential Information need not rise to the level of Trade Secret in order to be protected from disclosure by this Agreement. Confidential Information includes, but is not limited to, information about: BrightView's operations, services, and research and development of BrightView's operations or services; names and other listings of current or prospective Customers, proposal to any current or prospective Customers, the terms of any arrangements or agreement with any Customers, including payment and pricing information, and the implementation of Customer-specific projects;

> the composition or description of future services that will or may be offered by BrightView; marketing strategies; financial and sales information; and the technical expertise and know-how developed by BrightView, including the unique manner in which BrightView conducts its business. Confidential Information also includes information disclosed to BrightView by any third party (including, but not limited to, current or prospective Customers) that BrightView is required to treat as confidential.

*See* Agreement at § 1(c).

30. In Section 5 of the Agreement, Overton agreed that she would not compete with BrightView for a period of time in a limited geography upon the termination of her employment with BrightView:

> **Non-Competition.** Team member agrees that during team member's employment and for a period of one (1) year following the voluntary or involuntary termination of team member's employment for any reason . . ., team member will not, directly or Indirectly, own, manage, operate, join, control, be employed by or with, or participate in any manner with a Competing Business anywhere in the Restricted Territory where doing so will require team member to provide the same or substantially similar services to a Competing Business as those that team member provided to BrightView during the Look Back Period o[r] such other services that would result in the use or disclosure of Confidential Information. The foregoing is also limited to providing services in the area(s) of BrightView's business as to which team member had material business related involvement or received Confidential Information during the Look Back Period.

*See* Agreement at § 5.

31. The Agreement defines a "Competing Business" as "any individual (including team member), corporation, limited liability company, partnership, joint venture, association, or other entity, regardless of form, that is directly engaged in whole or in relevant part in any business or enterprise that is the same as, or substantially the same as, any part of the Business of BrightView, or that is taking material steps to engage in such Business." *See* Agreement at § 1(b). The "Business" of BrightView is defined as "providing landscape and snow and ice removal services

to Customers throughout the Hittle States and abroad, including landscape and sports turf design, construction, maintenance, and enhancement, tree care, water management and irrigation, and snow and ice removal." *Id.* at § 1(a).

32. The Agreement defines the "Look Back Period" as "the two (2) year period preceding the voluntary or involuntary termination of team member's employment with BrightView for any reason." *See* Agreement at § 1(d).

33. The Agreement defines the "Restricted Territory" as "the geographic territory in which team member worked, represented BrightView, or had Material Business Contact with BrightView's Customers in the Look Back Period." *See* Agreement at § 1(g). "Material Business Contact" means "contact that is intended to establish or strengthen a business or professional relationship for BrightView, regardless of whether the contact is with a Customer directly assigned to team member or a Customer with which team member otherwise has contact in furtherance of the team member's job duties." *Id.* at § 1(f).

34. In Section 6 of the Agreement, Overton promised that she would not solicit, directly or "Indirectly," BrightView's "Customers" as follows:

> **Non-Solicitation of Customers.** Team member agrees that during team member's employment for a period of two (2) years following the voluntary or involuntary termination of team member's employment for any reason . . ., team member will not, either on behalf of team member or for any Competing Business, directly or Indirectly solicit, divert, or appropriate, or attempt to solicit, divert, or appropriate any Customer or accept any business from any Customer with whom team member had Material Business Contact in the Look Back Period, for the purposes of providing services that are the same as or substantially similar to those provided in the Business of BrightView.

*See* Agreement at § 6.

35. The Agreement defines "Customer" as "those individuals, companies, or other entities for whom BrightView has provided or does provide products or services in connection

with the Business of BrightView or to whom BrightView has provided written proposal concerning the Business of BrightView and as to which team member has had Material Business Contact or received Confidential Information [during the Look Back Period].” *See* Agreement at § 1(d). By agreeing not to solicit Customers directly or “Indirectly,” Overton agreed that she would not “assist others in performing or direct or control others to perform activities” that she “is prohibited from engaging in directly pursuant to the terms of this Agreement.” *See id.* at § 1(e).

36. In the Agreement, Overton agreed that her restrictive covenants were reasonably designed to protect BrightView’s legitimate interests in protecting its goodwill and Confidential Information, and further, that any breach of the restrictive covenants would cause BrightView serious and irreparable injuries for which injunctive relief is the appropriate remedy:

> **Relief, Remedies, and Enforcement.** The parties acknowledge that BrightView is engaged in a highly competitive business and the covenants and restrictions contained in this Agreement, including the geographic and temporal restrictions, are reasonably designed to protect BrightView’s legitimate business interests, including Company goodwill and Customer and other business relationships, Confidential Information and Trade Secrets, and the specialized skills and knowledge gained by team member . . . during their employment. Team member acknowledges and agrees that a breach of any provision of this Agreement by the team member will cause serious and irreparable injury to BrightView that will be difficult to quantify and which may not be adequately compensated by monetary damages alone. Thus, in the event of a breach or threatened breach of this Agreement by team member, BrightView shall be entitled to injunctive relief, both temporary and final, enjoining and restraining such breach or threatened breach, despite any agreement between the two parties to arbitrate any disputes related to any aspect of team member’s employment.

*See* Agreement at § 13.

**B. Overton’s Employment with BrightView.**

37. Overton began her career with BrightView in September of 2020, when she was hired as an Account Manager for BrightView’s Fishers Branch Office located outside northeast



FP 62623565.3

Indianapolis, a position she maintained through the date of her departure in December of 2025. Overton was the primary point of contact for BrightView for all customers assigned to her by BrightView.

38. In her role as Account Manager, Overton had responsibility for more than thirty (30) customer sites primarily located east of Indianapolis in a territory comprised of the areas east of Keystone Parkway/Keystone Avenue, north of I-74, south of HW 32, and west of HW 9 as depicted in the following image:






FP 62623565.3

39. In the role of Account Manager, Overton was responsible for client satisfaction. She was expected to maintain and develop long-term relationships with clients, to perform site walkthroughs to ensure that quality and service expectations were being met, and to facilitate the resolution of client concerns to ensure renewal. She was the "face" of BrightView for the customers in her territory.

40. Overton's job as an Account Manager also entailed proactively presenting business enhancement ideas to her clients to expand the scope of services BrightView provided at each property. She was also expected to assist BrightView in responding to requests for proposals from new and existing clients, including by helping to create project estimates based on BrightView's confidential cost and pricing data. Finally, Overton was expected to look for and solicit referrals from existing clients to pass along to BrightView's Business Developers.

41. BrightView also supplied and gave Overton access to a tremendous amount of confidential information.

42. Throughout her tenure at BrightView, Overton had access to BrightView's Customer Relationship Management database ("CRM"). By using the CRM, Overton learned many types of client-specific data, including (a) the identities of the precise individuals at customer businesses who made purchasing and contracting decisions (such as a property/facility manger or chief engineer who cannot be easily identified through public sources without much time and effort); (b) the services that customers utilized; (c) their estimated annual spend; and (d) whether they were happy, unhappy, or had any service-related issues.

43. BrightView also shared other highly sensitive information with Overton, including its gross margin percentages; material and subcontractor markup percentages; the national rebates



FP 62623565.3

that BrightView receives from certain vendors; the identities of subcontractors who offer BrightView specialized pricing and the terms of such pricing; the identities of vendors who supply bulk and bagged salt and the prices they charge BrightView (a key factor for pricing snow removal services); BrightView's composite labor rates in and around Indianapolis; and the identities of customer prospects that BrightView is targeting.

44. Overton was also intimately familiar with BrightView's proprietary method of estimating costs and setting pricing for customer projects or maintenance contracts, and she knew BrightView's target profit margins for customer bids.

45. The branch in which Overton worked routinely held branch meetings that Overton attended. During these meetings, the attendees shared information about business opportunities and customer issues, and Overton used that information to help her with her business development responsibilities for BrightView.

**C. The VEI Relationship**

46. The Community Health Network, Inc. is a healthcare system with more than 200 sites of care throughout central Indiana, including more than 50 in the greater Indianapolis region alone. VEI is a wholly-owned subsidiary that, among other things, engages and manages contractors to perform landscaping maintenance and snow and ice removal services at the properties where Community Health Network affiliates provide healthcare services. As such, VEI manages a significant real estate portfolio and is a major customer for commercial landscaping services in and around Indianapolis, likely exceeding $1 million in annual spending on such services in this region.

47. At the time BrightView hired Overton, VEI had been a BrightView customer for at least ten (10) years, and it was one of the more significant accounts assigned to Overton at the start of her employment.

48. BrightView presently performs landscaping, maintenance and snow and ice removal services on more than half VEI's properties in and around Indianapolis.

49. VEI employs one property manager to oversee all its properties in the Indianapolis region, and thus there is one person with the authority to decide which contractors VEI hires to provide landscaping maintenance and snow and ice removal services at its various properties. Accordingly, the VEI property manager is a key relationship entrusted to the care of the Account Manager.

50. For five years Overton built a close relationship with the VEI property manager on behalf of BrightView, using BrightView's resources and while receiving a BrightView salary. For example, BrightView paid for Overton to send personalized gifts on holidays and for other personalized events intended to strengthen and solidify the relationship between Overton and the VEI property manager.

51. The purposes of the non-competition and non-solicitation clauses in Overton's Agreement with BrightView are two-fold. First, they ensure that Overton will not be able to capitalize on the goodwill BrightView paid her to create with customers like VEI, for the benefit of a new employer. The restricted period is intended to give BrightView the opportunity to assign a new Account Manger to VEI and for that person to have a reasonable time to re-build the relationship without simultaneous competition from the prior Account Manager (Overton).

52. Second, the non-competition and non-solicitation covenants guard against the use or disclosure of BrightView confidential information that Overton knows by heart by affording a chance for the information to evolve and grow stale with the passage of time

53. Every one of BrightView's contracts with VEI to perform services at its various properties is terminable at will, subject only to a short notice period. This makes it even more critical that BrightView have an opportunity to rebuild a relationship of trust with VEI and its property manager, free from the influence of the personal relationship that Overton formed with her VEI contact.

**D. Overton is Breaching her Agreement with BrightView.**

54. Overton voluntarily terminated her employment with BrightView on December 30, 2025.

55. During her exit interview, Overton informed BrightView that she had accepted a position with Hittle as a Marketing & Sales Director, and she represented that she would not be working in her restricted BrightView territory.

56. According to its website, Hittle provides "commercial landscaping to large and small businesses in greater Indianapolis and surrounding areas… Hittle Landscaping's commercial landscaping clients include large national organizations to small, local companies." https://hittlelandscape.com/commercial-landscaping-indianapolis/

57. Among the services that Hittle provides for its commercial clients are grounds care and maintenance, lawn service, tree & shrub care, irrigation system design, installation and maintenance, facility maintenance, snow and ice removal, and seasonal landscaping. https://hittlelandscape.com/commercial-landscaping-indianapolis/maintenance/

58. Hittle is a competitor of BrightView.

59. Hittle is a Competing Business as defined by the Agreement.

60. Hittle is also a significant competitor for VEI's work. At the time of Overton's departure, Hittle had successfully bid on VEI contracts to perform landscaping services at roughly 21 VEI properties.

61. Both Hittle and Overton have confirmed that Overton has been assigned to act as an Account Manager for at least some of those VEI properties, and BrightView has received confirmation that Overton has been working with the same VEI property manager with whom Overton worked while she was at BrightView.

62. The following map depicts the location of VEI properties serviced by both BrightView and Hittle. The VEI properties serviced by BrightView are indicated with red markers, while the Hittle serviced properties are indicated with yellow. Overton's Restricted Territory is show by the red boundary line.




63. In late February or Early March, Overton reached out to a BrightView subcontractor to inquire about what maintenance product the subcontractor used to service VEI properties on which he worked for BrightView. During that call, Overton disclosed that she was managing landscaping projects for VEI in her new role with Hittle, and that she had recently met with the VEI property manager who was and remains BrightView's main contact for all its VEI-related work.

64. Upon learning this, BrightView's attorney sent Overton a letter on March 3, 2026, to remind her of her contractual obligations, to demand that she provide information concerning her role and responsibilities with Hittle, and to demand that she disclose any ongoing contact with BrightView customers. A true and correct copy of BrightView's March 3, 2026 letter to Overton is attached hereto as Exhibit B.

65. Brightview, again through counsel, sent a similar letter to Hittle to ensure it was on notice of Overton's contractual obligations and to request information concerning Overton's position. A true and correct copy of BrightView's March 3, 2025 letter to Hittle is attached hereto as Exhibit C.

66. Overton responded on March 16, 2026 by Email and acknowledged "I am currently an Account Manager for Hittle Landscaping." Overton went on to explain that "My assigned area does not overlap with the restricted territory, nor does it overlap with the work I was performing for my past employer's client." However, Overton also conceded that "I am in contact with [VEI's property manager] and her staff only concerning the VEI South locations for Hittle" which she contends does not violate her Agreement. A true and correct copy of Overton's March 16, 2025 Email is attached hereto as Exhibit D.

67. Hittle responded separately, also on March 16, 2026, and it also acknowledged that "Overton is providing account services for VEI…" Hittle's letter explained that it did not believe doing so violated Overton's BrightView Agreement because her services were "for VEI locations outside of the restricted territory" and because "Hittle secured that VEI business via service contracts at those locations prior to Ms. Overton joining Hittle and/or without any solicitation, diversion or appropriation by Ms. Overton." A true and correct copy of Hittle's March 16, 2026 letter is attached hereto as Exhibit E.

68. Upon information and belief, the Account Manager position at Hittle is substantially the same as the Account Manager position at BrightView. As such, Overton is expected to maintain Hittle's existing business relationships and grow those relationships by soliciting additional work from the clients that Hittle assigns to her, including VEI, and/or assisting business developers at Hittle to do so.

69. Upon information and belief, Hittle's Account Managers meet on a weekly basis to share information about customers, ongoing projects, contract renewals, pricing, ancillary project opportunities, and various other information related to their work. As such, Overton is in a position to share BrightView's confidential information with any Hittle Account Manager who may have been assigned to her former clients or who may be competing with BrightView in Overton's Restricted Territory. Also, by assisting others to pursue business with VEI at properties located within her Restricted Territory, Overton is "Indirectly" engaging in activities that are prohibited under the Agreement.

70. As reflected in the map above, Hittle provides services to at least nine VEI properties located within Overton's Restricted Territory.

71. As a result, unless Hittle has assigned a separate Account Manager to handle the VEI properties located in Overton's Restricted Territory, the representations from both Overton and Hittle that Overton is not working on any accounts within her Restricted Territory are false.

72. Upon information and belief, which includes VEI's stated preference for working with only one Account Manager per company, Hittle has not assigned a separate Account Manager to handle the VEI properties it services that are within Overton's Restricted Territory, and she is therefore in breach of her non-competition agreement. Ex. A at § 5.

73. And even if Hittle has assigned a separate Account Manager for those properties, it is a virtual certainty that Overton is coordinating with that manager to ensure consistency on matters relating to customer service, pricing, and business development given that Hittle's Account Managers can communicate with one another and meet weekly for the specific purpose of sharing information and coordinating services. This constitutes a violation of her non-competition and non-solicitation covenants which both prevent direct *and indirect* engagement in restricted activities. Ex. A at § 6.

74. Finally, even if Overton has been completely walled off from all information related to VEI properties within her Restricted Territory, Overton's work as an Account Manager for VEI outside her Restricted Territory remains a violation her non-solicitation obligations.

75. That is because Overton is required as part of her role as an Account Manager to expand Hittle's business with VEI. For example, Account Managers are expected to suggest ancillary services at every property they manage, which is generally any work that falls outside the scope of work they are already contracted to perform. This can include beautification projects, ground repairs, or any number of other significant projects the company might recommend or observe to be necessary while on the job. That is work that could be bid out to anyone and that BrightView could have competed for.

76. As a result, every time Overton recommends an ancillary service to VEI (or any of her former BrightView customers), she is in violation of her non-solicitation agreement, which expressly provides that she may not "directly or Indirectly solicit, divert, or appropriate, or attempt to solicit, divert, or appropriate any Customer … with whom [Overton] had Material Business Contact…"

77. Critically, Overton's obligation to refrain from soliciting her former BrightView clients is not geographically limited. Rather it is limited by the specific customers with whom she had "Material Business Contact," which is defined in the Agreement as "contact intended to establish or strengthen a business or professional relationship for BrightView…" Ex. A at § 1(f).

78. VEI is a Material Business Contact given that Overton managed all of BrightView's accounts with VEI at almost two dozen properties.

79. BrightView regularly competes with Hittle for business from VEI throughout the areas surrounding Indianapolis, including the Hittle territories to which Overton has been assigned. BrightView and Hittle compete both for long term landscaping and property maintenance projects as well as for ancillary services with VEI across its entire portfolio of properties throughout the region.

80. Overton formed significant goodwill with VEI's property manager during the five years she serviced VEI for BrightView and obtained significant confidential information about that account and BrightView's operations in general. She is now in a position to leverage that goodwill and confidential information for Hittle as an Account Manager working closely with the same VEI property manager, performing an identical role in which she is expected to expand Hittle's business opportunities with VEI.

81. Unless enjoined, Overton will continue to breach obligations owed to BrightView under the terms of the Agreement.

82. BrightView has sustained, and will continue to sustain, serious and substantial injuries for which there is no adequate remedy at law.

**Count I**
**<u>Breach of Contract</u>**

83. BrightView incorporates by reference the allegations of Paragraphs 1 through 81 as if fully set forth herein.

84. BrightView and Overton are parties to the Agreement, the Agreement is supported by consideration, and the restrictive covenants set forth therein are ancillary to the Agreement.

85. Overton voluntarily resigned from BrightView on December 30, 2025.

86. Overton is currently employed by Hittle.

87. Hittle is a Competing Business under the Agreement.

88. Overton is working for Hittle as an Account Manager.

89. Overton is providing services for Hittle that are the same as or substantially similar to those that he provided for BrightView during the last two years of her employment with BrightView.

90. Upon information and belief, the services that Overton is providing for Hittle is resulting, or will result in, the use or disclosure of BrightView's Confidential Information.

91. Upon information and belief, Overton has directly or Indirectly (as defined by the Agreement) (a) solicited, diverted, appropriated, or accepted, (b) attempted to solicit, divert, appropriate, or accept, or (c) threatens to solicit, divert, appropriate, or accept business from one or more Customers with whom Overton had Material Business Contact during the last two years of her employment with BrightView.

92. Upon information and belief, Overton has been assigned to work and is continuing to work for Hittle in a geography that includes the same territory that she covered as an Account Manager for BrightView's Fishers branch office.

93. The area to which Overton has been assigned to work and is continuing to work for Hittle falls within the geographic scope of the Restricted Territory under the Agreement.

94. By virtue of the foregoing actions, Overton has breached, and continues to threaten to breach, the non-competition, non-disclosure, and non-solicitation restraints that are set forth in Sections 3, 5, and 6 of the Agreement.

95. The non-competition, non-disclosure, and non-solicitation restraints that are set forth in Sections 3, 5, and 6 of the Agreement are reasonable in duration, geographic, and substantive scope.

96. The non-competition, non-disclosure, and non-solicitation restraints that are set forth in Sections 3, 5, and 6 of the Agreement are no greater than necessary to protect legitimate interests of BrightView, including, but not limited to, its interests in protecting its goodwill and its Confidential Information.

97. As a result of the foregoing breaches of the Agreement, BrightView has sustained, and will continue to sustain, damages.

98. Unless Overton is enjoined from the foregoing conduct, BrightView will be irreparably harmed by the loss of goodwill, the disclosure and use of its Confidential Information, the loss of the benefit of its investments, and present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

99. In the Agreement, Overton agreed that BrightView would be irreparably harmed by her breach or threatened breach of the Agreement and that, therefore, BrightView is entitled to injunctive relief and any other equitable relief allowed by law. See Agreement at § 13.

100. In the Agreement, Overton agreed that her knowledge, skills, and abilities are sufficient to permit her to earn a livelihood satisfactory to her without violating any provision set forth in Sections 3, 5, and 6 of the Agreement. See Agreement at § 13.

101. The balance of equities and public interest factors favor BrightView.

**Prayer for Relief**

WHEREFORE, BrightView demands judgment in its favor against Overton, together with the following relief:

A. an order granting preliminary and permanent injunctive relief to enjoin the use or disclosure of BrightView's Confidential Information as required by Section 3 of the Agreement;

B. an order granting preliminary and permanent injunctive relief to enjoin Overton, for one year, from engaging in conduct in breach of the non-competition covenant set forth in Section 5 of the Agreement, including, but not limited to, an order prohibiting Overton from providing the same or substantially similar services for a Competing Business in the Restricted Territory as those that Overton provided for BrightView;

C. an order granting preliminary and permanent injunctive relief to enjoin Overton, for two years, from engaging in conduct in breach of the non-solicitation covenant set forth in Section 6 of the Agreement;

D. an award of damages for such actual losses as may be proven at trial;

E. an award of attorneys' fees, costs, and interest as permitted by law; and/or

F. such other and further relief as this Court deems just and equitable.

Respectfully submitted,

/s/ Craig P. Siegenthaler

Craig P. Siegenthaler
Erin Shaughnessy (In. Bar #36076-22)
Fisher & Phillips LLP
220 West Main Street, Suite 1700
Louisville, Kentucky 40202
Phone: (502) 561-3990
Fax: (502) 561-3991
E-mail: csiegenthaler@fisherphillips.com
eshaughnessy@fisherphillips.com

Paul J. Greco, Esquire
(motion for admission *pro hac vice* forthcoming)
Andrew S. Gallinaro, Esquire
(motion for admission *pro hac vice* forthcoming)
FISHER & PHILLIPS LLP
Two Logan Square
100 N. 18th Street – 12th Floor
Philadelphia, PA 19103
Tel. (610) 230-2146/2178
Fax (610) 230-2151
Email pgreco@fisherphillips.com
agallinaro@fisherphillips.com

Dated: April 13, 2026 *Counsel for Plaintiff BrightView Landscapes, LLC*

**VERIFICATION**

I, Bill Schell, verify that I am a Tree Care Manager of BrightView Landscapes, LLC and that I am authorized to execute this Verification on its behalf. I have read the Verified Complaint and the facts and information set forth therein are true and correct to the best of my knowledge, information, and belief. This Verification is made subject to 28 U.S.C. § 1746 relating to unsworn declarations under penalty of perjury.

| | |
|---|---|
| ________________ | ________________________________________ |
| Date | Bill Schell |